**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT MOORE, | ) Civil Action No. |
| | ) |
| *Plaintiff*, | ) Filed Electronically |
| | ) |
| vs. | ) |
| | ) |
| MIRACLE MOVERS OF PITTSBURGH LLC, | ) |
| | ) |
| *Defendant*. | ) |
| | ) |
| | ) |

## COMPLAINT IN CIVIL ACTION

Plaintiff, Robert Moore, by and through the undersigned counsel, files the following Complaint in Civil Action against Defendant, Miracle Movers of Pittsburgh, LLC, averring as follows:

## THE PARTIES

1.      Plaintiff, Robert Moore ("Plaintiff"), is an adult individual who resides in Pittsburgh, Pennsylvania.

2.      Defendant, Miracle Movers of Pittsburgh LLC ("Defendant"), is a Pennsylvania limited liability company with a registered office at 2626 Strathmore Lane, Bethel Park, Pennsylvania 15102. Defendant's principal place of business is located at 3633 Poplar Avenue, Pittsburgh, Pennsylvania 15234. The Plaintiff reported to work on a regular basis at such location (the "Facility").

## JURISDICTION AND VENUE

A.    **This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 and Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") (Plaintiff's claims arising under Title VII and the FLSA are identified as the "Federal Law Claims").

4.      Plaintiff is also advancing a claim under the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, *et seq.* (the "WPCL") (Plaintiff's claims arising under the WPCL are identified as the "State Law Claim").

5.      This Court may exercise supplemental jurisdiction over the State Law Claim pursuant to 28 U.S.C. § 1367(a) as the Federal Law Claims and the State Law Claim share operative facts that support the corresponding causes of action within the Federal Law Claims and the State Law Claim.

6.      Further, the operative facts between the Federal Law Claims and the State Law Claim mirror one another to such a degree that they form the "same case or controversy" under Article III § 2 of the United States Constitution which further supports this Court's exercise of supplemental jurisdiction over the State Law Claim.

**B.    The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

7.      Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (hereinafter, the "Western District") as a substantial part of the events and omissions giving rise to the Federal Law Claims and State Law Claim occurred within this judicial district. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

8.      Specifically, these events and omissions occurred within Allegheny County,

Pennsylvania, which is one of the counties encompassed by the Western District.

9.      This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Allegheny County, Pennsylvania, and conduct arising within Allegheny County is docketed within the Pittsburgh Division of the Western District pursuant to LCvR 3.

**C.      This Court May Exercise Personal Jurisdiction Over Defendant.**

10.      This Court may exercise personal jurisdiction over Defendant pursuant to 42 Pa. C.S. § 5301(a)(2), and this Court's exercise of jurisdiction comports with the Due Process Clause of the United States Constitution.

11.      Personal jurisdiction is proper over a defendant if the defendant is a registered Pennsylvania entity and has thus "consented" to the exercise of general personal jurisdiction pursuant to 42 Pa. C.S. § 5301.  *Aetna Inc. v. Kurtzman Carson Consultants, LLC*, No. 18-470, 2019 BL 114021, at *5 (E.D. Pa. Mar. 29, 2019) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Bane v. Netlink, Inc.*, 925 F.2d 637, 641 (3d Cir. 1991)).

12.      42 Pa. C.S. § 5301 states: "The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person."  42 Pa. C.S. § 5301(a). This definition is expanded to "corporations" pursuant to 42 Pa. C.S. § 5301(a)(2) which provides:

> Corporations.—
> (i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.
> (ii) Consent, to the extent authorized by the consent.
> (iii) The carrying on of a continuous and systematic part of its general business within this Commonwealth.

42 Pa. C.S. § 5301(a).

13.     As discussed above, Defendant has registered itself as a Pennsylvania limited liability company in the Commonwealth of Pennsylvania and thereby subjected itself to the general jurisdiction of Pennsylvania's tribunals; further, Defendant maintains the Facility in Pennsylvania and conducts continuous and systematic business operations within Pennsylvania. Accordingly, Defendant may properly be brought before this Court pursuant to 42 Pa. C.S. § 5301(a)(2).

**D.     Plaintiff Has Exhausted His Administrative Remedies; His Federal and State Law Claim are Properly Before This Court.**

14.     Plaintiff has satisfied all procedural and administrative prerequisites under 42 U.S.C. § 2000e-5 and may now proceed to bring this action before the Court. Specifically:

a.  On or about May 5, 2025, Plaintiff dually filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for the Federal Law Claims at charge number 533-2025-02036 (the "EEOC Charge").

b.  Plaintiff filed the EEOC Charge pursuant to the work sharing agreement existing between the two agencies. See *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 164 (3d Cir. 2013).

c.  On November 20, 2025, the EEOC issued the Notice of Right to Sue ("RTS Notice"), affording Plaintiff 90 days within which to timely file the Federal Law Claims and the State Law Claims.

d.  The instant Complaint is filed within the 90-day time period.

## FACTUAL BACKGROUND

15.     Plaintiff began his employment with Defendant in May 2024 in a hybrid position titled "General Sales Manager/Relocation Specialist" (the "Position").

16.     In the Position, Plaintiff performed numerous office-related duties, including direct communication with clients selling Defendant's services, general office-related phone calls, and

the scheduling and assignments of movers.

17.     As outlined more thoroughly below, Plaintiff's role required him to both administer Defendant's office and also sell Defendant's services.

18.     Plaintiff worked full-time for Defendant and was paid salaried wages ranging between $300 and $700 per week and commission wages that ranged between 4% and 6% of the revenue generated.

## Employment History and Training

19.     On June 1, 2024, Plaintiff commenced his training for the sales component of his role alongside his colleague Benny (last name unknown) ("Benny") and under the supervision of General Manager Darnell (last name unknown) ("Darnell").

20.     Shortly thereafter, Darnell quit without notice and created an immediate need for managerial work.

21.     At this time, Defendant's Managing Partner Andrew Zeffiro ("Mr. Zeffiro") assigned Darnell's duties to Plaintiff and in light of the fact that Plaintiff was assuming a second job consisting of Darnell's managerial duties while also maintaining the sales work, Plaintiff would be paid a weekly salary of $700 in addition to his commissions.

22.     Through the remainder of June 2024, Plaintiff performed his duties both managerial and sales.

## Wage Violations

23.     At all times relevant herein, prior to his official start date, Mr. Zeffiro outlined a commission-based compensation structure to Plaintiff, stipulating that Plaintiff would not receive any commission during his first month but would receive a weekly salary of $700.

24.     Thereafter, Plaintiff's base salary would decrease incrementally—from $500 per

week to $300 per week—while his commission percentage was to increase in recompense.

25.     Ultimately, Plaintiff was to receive 4% commission for office leads, including online advertisements, and 6% commission for sales-generated leads, which was when he found the jobs himself.

26.     In performing his sales duties, Plaintiff became entitled to his sales commissions.

27.     In July 2024, Plaintiff asked Mr. Zeffiro as to when his commissions would be paid. Mr. Zeffiro provided a vague unresponsive answer at this time.

28.     In early August 2024, Mr. Zeffiro informed Plaintiff that an alleged fraudulent incident had resulted in the dismissal of the corporate accountant, which caused delays in commission disbursement.

29.     Through August, September, and October 2024, Plaintiff was not paid his commissions (the "Outstanding Commissions"). Plaintiff reported the lack of payments to Mr. Zeffiro who would not substantively engage with Plaintiff or would assure him that the payments were forthcoming.

30.     The Outstanding Commissions total approximately $10,000.

31.     In October 2024, Plaintiff notified Defendant, through Mr. Zeffiro, that Defendant was to begin allocating wages from his paystub for a child support obligation and that Defendant was to direct said funds to the court for payment.

32.     Accordingly, in October 2024, Defendant began deducting wages from Plaintiff's paychecks for this obligation.

33.     In November of 2024, Mr. Zeffiro was administratively suspended for 60 days following a physical altercation with a coworker. Defendant appointed Matt Miller ("Mr. Miller") to fulfill Mr. Zeffiro's responsibilities at this time.

34.    At this time, Plaintiff approached Mr. Miller concerning the Outstanding Commissions. Mr. Miller indicated that the wages would be paid eventually as a lump sum and remarked to Plaintiff that no individual should occupy both a managerial role earning salaried wages and also a sales role earning commission-based wages.

35.    Plaintiff outlined the development of circumstances that led to his hybrid role to which Mr. Miller then stated Plaintiff should be, "*boots on the ground*," meaning to spend less of Plaintiff's time in the office and more pursuing sales.

36.    After this conversation, Plaintiff adhered to Mr. Miller's instruction and dedicated more of his time to his sales capacity and less to the administrative functions assigned to him.

37.    From November of 2024 to January of 2025, Defendant began issuing paychecks to Plaintiff that would not clear.

38.    While Defendant attempted to remedy said payments through alternative payment processors, such as Cash App and Venmo, it was clear Defendant was in a state of financial distress.

39.    As of Plaintiff's termination, Plaintiff was not paid the Outstanding Commissions and these funds remain owed to present day.

40.    Further, in January of 2025, Plaintiff discovered that Defendant had not transmitted the wages it withheld from Plaintiff's paychecks designated for Plaintiff's child support payments.

41.    These child support funds that Defendant withheld but failed to transmit to the court total thousands of dollars.

### Discriminatory Conduct and Hostile Work Environment

42.    Plaintiff, is an African American man.

43.    During his tenure with Defendant, Plaintiff was the only African American

7

individual employed in the "office" side of the company.

44.    On November 5, 2024, one of Defendant's vendors, a mechanic who upon information and belief serviced Defendant's trucks, called Mr. Zeffiro while Plaintiff was seated nearby in Mr. Zeffiro's office.

45.    Mr. Zeffiro engaged the mechanic in casual conversation and asked the mechanic the plans he had for the day.

46.    In response, and in reference to the presidential election occurring that day, the mechanic remarked that he was, "*getting ready to go vote for that nigger*."

47.    Rather than immediately addressing or reprimanding the individual, Mr. Zeffiro merely responded with "woah" before removing the call from speakerphone mode.

48.    Mr. Zeffiro then attempted to downplay the severity of the incident and the mechanic, discovering that other individuals were present on the call, requested that Mr. Zeffiro, "*tell those guys I'm not racist*."

49.    At no point in time did Mr. Zeffiro take any accountability for this conduct, outline a dedication to ensuring that Plaintiff or his colleagues were not subjected to racial slurs in the future, nor take accountability for subjecting Plaintiff to one of the most heinous slurs in contemporary society.

50.    Mr. Zeffiro's conduct is not surprising as after the fact, other coworkers informed Plaintiff that Mr. Zeffiro used that same slur in the workplace and had later confronted him via text message regarding it.

51.    Later, in November of 2024 and as discussed above, Mr. Miller was assigned to fulfill Mr. Zeffiro's duties.

52.    During this tenure, Plaintiff observed a pattern of discriminatory job assignments,

wherein Defendant consistently allocated the more desirable and profitable work—in the form of route assignments—to other Caucasian employees.

53.     Defendant's actions systematically excluded African American employees from receiving these desirable routes.

54.     Plaintiff was specifically impacted by this practice and correspondingly had less work available to him.

<u>**Termination**</u>

55.     In January 2025, Mr. Zeffiro returned to work from his administrative leave.

56.     Shortly following this return, Plaintiff arrived at Defendant's office to retrieve a paycheck. When he arrived at the office, Mr. Zeffiro pulled Plaintiff aside and informed him that he was terminated.

57.     Plaintiff inquired as to what the reasoning behind the termination was. Mr. Zeffiro's only response was that the decision was made by the corporate office.

58.     In the days following his termination, Plaintiff received a letter from Defendant which stated that the reasoning for his termination included "insubordination" without elaboration.

59.     Further, the letter indicated that Plaintiff's "closing rate" was at 12%.

60.     Plaintiff was perplexed by this reasoning as he had only ever received one low closing rate in all the months he was employed—specifically this low rate was due to the cold weather and corresponding slow season.

61.     Plaintiff's remaining closing rates ranged around 60% or higher and were routinely higher than his Caucasian peers.

62.     The letter further cited "Rob's absence from daily office." In response, Plaintiff called Mr. Zeffiro and told him he was directed by Mr. Miller to come into the office less and

focus more on the sales aspect of his position.

63.    Mr. Zeffiro's then stated that someone in Defendant's human resources department "*mixed him up*" with another "*Rob*."

64.    Plaintiff then asked if he could have his job back in light of the clerical error, however, Mr. Zeffiro refused.

### COUNT I
### FAILURE TO PAY WAGES IN VIOLATION OF THE FLSA
### 29 U.S.C. § 201, *et seq.*

65.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

66.    The FLSA mandates certain minimum rates of pay for time covered "employees" spend dedicated to workplace operations. 29 U.S.C. §§ 206, 207.

67.    The FLSA establishes that employers must pay employees for all hours worked and prohibits employers from failing to compensate employees for work performed. 29 U.S.C. § 206.

68.    The minimum pay mandates are incumbent upon "employers" who through the course of their business practices are "engaged in commerce." 29 U.S.C. §§ 203(d), (s)(1).

69.    The FLSA defines the term "employer" expansively to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

70.    In interpreting this broad phrase, the United States Court of Appeals for the Third Circuit concluded that liability for violations of the FLSA clearly attaches to the corporate entity itself, here, Defendant. See *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 153 (3d Cir. 2014).

71.    The FLSA provides several exceptions to the wage payment requirements when an employee is deemed "exempt." 29 U.S.C. § 213.

72.     Plaintiff's primary duties included direct communication with clients selling Defendant's services, general office-related phone calls, scheduling and assignments of movers, and performing managerial functions after Darnell's departure.

73.     Plaintiff did not meet any requirements to be "exempt" from the FLSA's provisions.

74.     As such, Defendant was required to compensate Plaintiff for all work performed, including all commission-based wages owed for sales generated.

**A.    Plaintiff was Denied Wages Owed Pursuant to 29 U.S.C. § 206.**

75.     At all times relevant hereto, Defendant was mandated to pay Plaintiff all wages owed for work performed, including both salaried wages and commission-based compensation. 29 U.S.C. § 206.

76.     Instead, Defendant elected to withhold and fail to pay Plaintiff's earned commission wages, thereby depriving Plaintiff of the wages to which he was entitled.

77.     As set forth above, Plaintiff was entitled to receive 4% commission for office leads, including online advertisements, and 6% commission for sales-generated leads which he found himself.

78.     From August 2024 through October 2024, Plaintiff performed substantial sales work for Defendant and generated significant revenue through his sales efforts.

79.     Despite Plaintiff's sales performance and entitlement to commission wages, Defendant failed to pay Plaintiff the commissions he had earned during this period (the "Outstanding Commissions").

80.     Plaintiff made repeated inquiries to Mr. Zeffiro and Mr. Miller regarding the Outstanding Commissions, but Defendant refused to substantively engage with Plaintiff or merely assured him that payments were forthcoming.

81.     The Outstanding Commissions total approximately $10,000.

82.    Additionally, from November 2024 through January 2025, Defendant issued multiple paychecks to Plaintiff for his salaried wages that failed to clear when Plaintiff attempted to deposit them.

83.    While Defendant attempted to remedy some of these failed payments through alternative payment processors, such as Cash App and Venmo, Defendant failed to timely and properly compensate Plaintiff for his work.

84.    Furthermore, beginning in October 2024, Defendant deducted wages from Plaintiff's paychecks designated for Plaintiff's child support obligations.

85.    Defendant withheld thousands of dollars from Plaintiff's paychecks for these child support payments but failed to transmit these withheld funds to the court as required.

86.    By withholding these funds from Plaintiff's paychecks without transmitting them to the proper authorities, Defendant effectively failed to pay Plaintiff the full wages to which he was entitled.

87.    Plaintiff attempted to obtain his owed commission wages and properly issued paychecks, but Defendant consistently failed to meet its wage payment obligations.

88.    At the time of Plaintiff's termination in January 2025, Plaintiff had not been paid the Outstanding Commissions and these funds remain owed to present day.

89.    Thus, Plaintiff is owed approximately $10,000 in Outstanding Commissions (the "Unpaid Wages") due to Defendant's failure to pay Plaintiff the wages he earned through his sales work for Defendant.

**B.    Plaintiff is Entitled to Liquidated Damages, Attorney Fees, and Costs.**

90.    29 U.S.C. § 216(b) of the FLSA provides that when an employer violates 29 U.S.C. § 206, an employee may collect liquidated damages in an amount equal to the amount of wages that are due and owing and, additionally, an award of attorney's fees.

91.    An award of liquidated damages pursuant to the FLSA is not penal in nature, but rather, is viewed as a compensatory remedy. *Martin v. Selker Bros.*, 949 F.2d 1286, 1299 (3d Cir. 1991) (citing *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583-84 (1942)).

92.    Indeed, the Supreme Court of the United States has opined on the compensatory nature of this remedy, describing it as compensation for the "workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Schonewolf v. Waste Mgmt., Inc.*, No. 17-3745, 2018 BL 92619, at *5 (E.D. Pa. Mar. 19, 2018) (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707-08 (1945)).

93.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered tangible economic and pecuniary loss in forms including, but not limited to, the deprivation of the lawfully owed wages.

94.    As the Defendant violated 29 U.S.C. § 206, it is liable to Plaintiff for liquidated damages (100% of the Unpaid Wages), as well as reasonable attorneys' fees, costs, and expenses pursuant to 29 U.S.C. § 216(b).

WHEREFORE, Plaintiff, Robert Moore, seeks a judgment against Defendant, Miracle Movers of Pittsburgh LLC, for willful noncompliance of the FLSA and seeks: (i) compensatory damages, including but not limited to, his Unpaid Wages in the amount of $10,000; (ii) liquidated damages equal to the amount of Unpaid Wages in the amount of $10,000; (iii) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; and (iv) any further legal and equitable relief as this Court may deem just and proper.

## COUNT II
## FAILURE TO PAY WAGES IN
## VIOLATION OF THE WPCL
## 43 P.S. § 260.1, *et seq.*

95.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully

set forth at length herein.

96.    The Pennsylvania Wage Payment and Collection Law ("WPCL") requires employers to pay all earned wages, including commissions, to employees by the regular payday designated by the employer. 43 P.S. § 260.3.

97.    The WPCL broadly defines "wages" to include "all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation." 43 P.S. § 260.2a.

98.    This definition explicitly includes commissions as wages that must be paid in accordance with the WPCL's requirements.

99.    Further, the WPCL provides that "[e]very employer shall pay all wages, other than fringe benefits and wage supplements, due to his employes on regular paydays designated in advance by the employer." 43 P.S. § 260.3.

100.    The WPCL makes clear that an employer's obligation to pay wages includes ensuring that any deductions from an employee's wages for purposes such as child support are properly transmitted to the appropriate authorities.

A.    **Defendant Failed to Pay Plaintiff Earned Wages in Violation of the WPCL.**

101.    At all times relevant hereto, Defendant was mandated to pay Plaintiff all wages owed for work performed, including commission-based compensation earned through his sales activities. 43 P.S. § 260.3.

102.    As set forth above, Plaintiff was entitled to receive 4% commission for office leads, including online advertisements, and 6% commission for sales-generated leads which he found himself.

103.    From August 2024 through October 2024, Plaintiff performed substantial sales work for Defendant and generated significant revenue through his sales efforts for which he earned

commissions.

104.    Despite Plaintiff's entitlement to these commission wages, Defendant failed to pay Plaintiff the commissions he had earned during this period.

105.    The unpaid commissions total approximately $10,000.

106.    Additionally, from November 2024 through January 2025, Defendant issued multiple paychecks to Plaintiff that failed to clear when deposited, constituting a failure to pay wages as required by the WPCL.

107.    Furthermore, beginning in October 2024 and continuing through January 2025, Defendant deducted wages from Plaintiff's paychecks for child support obligations.

108.    However, Defendant failed to transmit these withheld funds to the court as required, effectively withholding thousands of dollars that should have been directed to Plaintiff's child support account.

109.    By withholding these funds from Plaintiff's paychecks without transmitting them to the proper authorities, Defendant converted Plaintiff's wages for its own use and failed to pay Plaintiff the full wages to which he was entitled.

110.    Plaintiff made repeated inquiries to Defendant regarding the unpaid commissions but Defendant refused to substantively engage with Plaintiff or merely assured him that payments were forthcoming.

111.    At the time of Plaintiff's termination in January 2025, Plaintiff had not been paid his earned commissions and these funds remain owed to present day.

112.    The total amount of unpaid wages owed to Plaintiff is approximately $10,000.

**B.    Plaintiff is Entitled to Liquidated Damages.**

113.    The WPCL provides for liquidated damages of twenty-five percent (25%) of the total amount of wages due when an employer fails to pay wages as required. 43 P.S. § 260.10.

114.     As Defendant violated the WPCL by failing to pay Plaintiff $10,000 in earned commission wages, Plaintiff is entitled to liquidated damages in the amount of $2,500 (25% of $10,000).

115.     Therefore, the total amount owed to Plaintiff under the WPCL is $12,500, consisting of $10,000 in unpaid wages plus $2,500 in liquidated damages.

**C.     Plaintiff is Entitled to Attorney's Fees and Costs.**

116.     In addition to actual damages and liquidated damages, the WPCL provides for the recovery of attorney's fees and costs when an employer fails to pay wages as required. 43 P.S. § 260.9a(f).

117.     Defendant is liable to Plaintiff for actual damages (lost wages), liquidated damages, as well as reasonable attorney's fees, costs, and expenses pursuant to 43 P.S. § 260.9a(f).

118.     As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered tangible economic and pecuniary loss in forms including, but not limited to, the deprivation of the lawfully owed wages and commissions.

WHEREFORE, Plaintiff, Robert Moore, seeks a judgment against Defendant, Miracle Movers of Pittsburgh LLC, for willful noncompliance with the WPCL and seeks: (i) compensatory damages in the amount of $10,000 for unpaid wages; (ii) liquidated damages in the amount of $2,500 (25% of unpaid wages); (iii) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; and (iv) any further legal and equitable relief as this Court may deem just and proper.

### COUNT III
### RACIAL DISCRIMINATION AND RETALIATION
### IN VIOLATION OF TITLE VII
### 42 U.S.C. § 2000e, *et seq.*

119.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully

set forth at length herein.

120.    Title VII of the Civil Rights Act of 1964 embodies a clear public policy prohibiting discrimination in the workplace on the basis of race, ensuring that all individuals have equal opportunity in employment regardless of their racial background. 42 U.S.C. § 2000e, *et seq*.

121.    To establish a *prima facie* case of racial discrimination, a plaintiff must show that: (1) they are a member of a protected class; (2) they were qualified for the position at issue; (3) they were discharged or suffered some adverse employment action by the employer; and (4) they were ultimately replaced or treated less favorably under circumstances that support an inference of unlawful discrimination. *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018).

122.    To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate: (1) they engaged in a protected activity; (2) they suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).

123.    Protected activity includes opposing any practice made unlawful by Title VII, including making complaints about discrimination or harassment based on race. 42 U.S.C. § 2000e-3(a).

124.    A causal connection may be established through evidence of temporal proximity between the protected activity and the adverse action, or through other circumstantial evidence demonstrating a retaliatory motive. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997).

**A.    Plaintiff is a Member of a Protected Class.**

125.    At all times relevant hereto, Plaintiff was a member of a protected class insofar as Plaintiff is an African American individual.

126.    As averred hereinabove, Plaintiff was the only African American individual employed in the "office" side of Defendant's company during his tenure.

127.    Accordingly, Plaintiff is entitled to protection under Title VII from discrimination based on his race.

**B.    Plaintiff Was Qualified and Performing Job Satisfactorily.**

128.    Plaintiff possessed and exercised the skills, experience, and ability needed to perform the job duties of the Position.

129.    Specifically, Plaintiff was: sufficiently organized that he could appropriately answer telephone calls in the course of his administration of Defendant's office; sufficiently skilled in communication that he could effectively service Defendant's clients' immediate needs and persuade said clients into retaining Defendant's services; and possessed the necessary cognitive abilities to perform the miscellaneous functions the Position required.

130.    At all times material, Plaintiff was qualified to perform the essential duties of his position and did in fact perform those duties satisfactorily.

131.    Plaintiff performed his duties without substantive reprimand from the time he commenced employment with Defendant in May 2024 through his termination in January 2025.

132.    Plaintiff's performance was superior to his Caucasian colleagues over the course of his employment.

133.    Specifically, Plaintiff's closing rates routinely ranged around 60% or higher and were consistently higher than those of his Caucasian peers, demonstrating his strong performance in the sales component of his role.

**C.    Plaintiff Suffered an Adverse Employment Action.**

134.    Plaintiff suffered the ultimate adverse employment action when Defendant

terminated his employment in January 2025.

135.     The Third Circuit has held that termination constitutes a "serious and tangible" adverse employment action sufficient to alter an employee's compensation, terms, conditions, and privileges of employment. *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 765 (3d Cir. 2004).

**D.     Circumstances Support an Inference of Unlawful Discrimination and Retaliation.**

136.     The circumstances surrounding Plaintiff's termination support a strong inference of unlawful discrimination and retaliation based on Plaintiff's race.

137.     Plaintiff engaged in protected activity when he objected to and was subjected to the racial slur incident on November 5, 2024, and when he experienced the ongoing pattern of discriminatory route allocation practices that systematically excluded African American employees.

138.     Plaintiff's termination occurred in January 2025, shortly after Mr. Zeffiro returned from his administrative suspension following the racial slur incident and the hostile work environment that pervaded Plaintiff's employment.

139.     The temporal proximity between Plaintiff's experiences with race-based discrimination and his termination supports an inference that Defendant terminated Plaintiff in retaliation for being subjected to and objecting to the discriminatory conduct.

140.     Further, the stated reasons for Plaintiff's termination are demonstrably pretextual, as discussed more fully below, which supports an inference of discriminatory intent.

141.     Additionally, Plaintiff was disparately treated compared to his similarly situated Caucasian colleagues who were not subjected to termination despite engaging in the same or similar conduct.

142.     Defendant demonstrated discriminatory animus through the racial slur incident in

which Mr. Zeffiro, Defendant's managing partner, failed to take any corrective action when a vendor used a racial epithet in Plaintiff's presence.

143.    Further, as averred hereinabove, coworkers informed Plaintiff that Mr. Zeffiro himself had used the same racial slur in the workplace, demonstrating a pattern of racial animus at the highest levels of Defendant's management.

144.    The pattern of discriminatory route allocation that systematically favored Caucasian employees over African American employees, including Plaintiff, further demonstrates Defendant's discriminatory intent and practice.

145.    Plaintiff was specifically impacted by these discriminatory allocation practices, receiving less desirable work assignments and fewer opportunities to earn commission income compared to his Caucasian colleagues.

146.    These circumstances, taken together, create a compelling inference that Defendant's decision to terminate Plaintiff was motivated by discriminatory and retaliatory intent based on Plaintiff's race.

**E.    The Stated Reasons for Plaintiff's Termination Were Pretextual.**

147.    Defendant's stated reasons for terminating Plaintiff were demonstrably pretextual and served as a mere cover for unlawful discrimination and retaliation.

148.    Defendant claimed in its termination letter that Plaintiff was terminated for "insubordination," yet Defendant failed to provide any specific examples or elaboration of any allegedly insubordinate conduct.

149.    Plaintiff had performed his duties without substantive reprimand throughout his employment and had never been disciplined for insubordination prior to his termination.

150.    Defendant further claimed that Plaintiff's "closing rate" was at 12%, suggesting

poor sales performance.

151.    However, Plaintiff had only ever received one low closing rate during the entirety of his employment—specifically due to cold weather conditions and the corresponding slow season that affected all salespeople.

152.    In reality, Plaintiff's closing rates routinely ranged around 60% or higher and were consistently superior to those of his Caucasian peers.

153.    Defendant's reliance on a single low closing rate during a slow season, while ignoring Plaintiff's consistently superior overall performance, demonstrates the pretextual nature of this stated reason.

154.    Defendant also cited "Rob's absence from daily office" as a reason for termination.

155.    However, Plaintiff had been specifically instructed by Mr. Miller to spend less time in the office and to be more "boots on the ground" focusing on the sales aspect of his position.

156.    Plaintiff was merely following the direct instructions given to him by Defendant's management when he spent less time in the office.

157.    When Plaintiff objected to this stated reason and explained that he had been following Mr. Miller's instructions, Mr. Zeffiro admitted that someone in Defendant's human resources department had "mixed him up" with another "Rob."

158.    This admission of a clerical error demonstrates that at least one of Defendant's stated reasons for termination was factually incorrect, yet Defendant refused to reinstate Plaintiff despite acknowledging the error.

159.    The timing of Plaintiff's termination further supports the conclusion that the stated reasons were pretextual.

160.    Plaintiff was terminated shortly after Mr. Zeffiro returned from his administrative

suspension, which followed the racial slur incident and the hostile work environment to which Plaintiff had been subjected.

161.    This temporal proximity, combined with the demonstrably false and pretextual nature of the stated reasons, the admission of clerical error, and the evidence of discriminatory animus throughout Plaintiff's employment, establishes that Defendant's true motivation for terminating Plaintiff was discriminatory and retaliatory in nature.

**F.    Plaintiff is Entitled to Damages.**

162.    As a direct and proximate result of Defendant's discriminatory and retaliatory conduct in violation of Title VII, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

163.    Further, Defendant's conduct was willful, wanton, and malicious, demonstrating a reckless indifference to Plaintiff's federally protected rights under Title VII.

164.    Accordingly, Plaintiff is entitled to punitive damages in an amount sufficient to deter Defendant from engaging in future discriminatory and retaliatory conduct of a similar nature.

WHEREFORE, Plaintiff, Robert Moore, seeks a judgment against Defendant, Miracle Movers of Pittsburgh LLC, for willful noncompliance with Title VII and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of

back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v) pre-judgment and post-judgment interest where accorded by law; and (vi) any further legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

165.    Plaintiff demands a trial by jury on all matters so triable.


Date: January 26, 2026

                        Respectfully submitted,


                        **THE WORKERS' RIGHTS LAW GROUP, LLP**

By:    */s/ Brendan K. Petrick*
                        Brendan K. Petrick, Esq. (Pa. I.D. No. 88968)
                        */s/ Patrick W. Carothers*
                        Patrick W. Carothers, Esq. (Pa. I.D. No. 85721)
                        */s/ Garret A. Hampton*
                        Garret A. Hampton, Esq. (Pa. I.D. No. 338635)

                        The Workers' Rights Law Group, LLP
                        Foster Plaza 10
                        680 Andersen Drive, Suite 230
                        Pittsburgh, PA 15220
                        Telephone: 412.910.9592
                        Facsimile: 412.910.7510
                        brendan@workersrightslawgroup.com
                        patrick@workersrightslawgroup.com
                        garret@workersrightslawgroup.com

                        *Counsel for Plaintiff, Robert Moore*